**Robert ROEDER**

v.

**ALCOA STEAMSHIP CO., Inc.**

**Civ. A. No. 42901.**

United States District Court,
E. D. Pennsylvania.

March 6, 1972.

John Dorfman, Dorfman, Pechner, Sacks & Dorfman, Philadelphia, Pa., for plaintiff.

H. Wallace Roberts, Krusen, Evans & Byrne, Philadelphia, Pa., for defendant.

HANNUM, District Judge.

This is an admiralty action commenced on June 9, 1967, by seaman-plaintiff Robert Roeder to recover $13.85 in wages, plus penalties, pursuant to 46 U.S.C. § 596 from his employer-defendant Alcoa Steamship Co., Inc. The Honorable William H. Kirkpatrick, Senior Judge, United States District Court, entered summary judgment in plaintiff's favor for $32,450.55 plus interest, Roeder v. Alcoa Steamship Co., Inc., C.A. No. 42901 (E.D.Pa.1968). In an Opinion by the Honorable Francis L. Van Dusen, the United States Court of Appeals for the Third Circuit, reversed and remanded for trial.[1] On January 20, 1971, a trial was held on the complaint of Robert Roeder to recover wages and penalties.[2]

## FINDINGS OF FACT

1. Plaintiff, Robert M. Roeder, joined the SS ALCOA MASTER as a member of the deck department with the rating of deck maintenance on February 24, 1965 for a foreign voyage.

2. On July 2, 1965, the vessel was at sea bound for the Port of New York.

3. In addition to his duties regarding the cargo and maintenance of the vessel, the Chief Officer was responsible for maintaining discipline among the members of the deck department of the vessel and could secure sanctions against any seaman who was guilty of a breach of discipline.

4. The Chief Officer, K. E. Graham, had approximately 35 years at sea with approximately 24 years as an officer.

5. Chief Officer Graham, through the Bosun, assigned plaintiff and ordinary seaman, James R. Colson, to work on the after deck on July 2, 1965.

6. On July 2, 1965, Roeder, although holding a day worker's rating of Deck Maintenance, was standing the 4–8 sea watch along with ordinary seaman Colson.

7. A little after 4:00 p. m. on July 2, 1965, Chief Mate Graham had to go down and get Roeder out of his room to turn to for work.

8. Roeder was under the influence of intoxicants.

9. Roeder and Colson were assigned to work on the afterdeck.

10. Subsequently, Colson came to the Chief Mate's room and reported that Roeder had urinated in his face, and that he would no longer work with him.

11. Roeder had occasion to, and did, urinate over the side of the said vessel and the spray from his "call of nature" was carried by the wind into co-worker Colson's face.

12. Upon hearing the report of Colson, the Chief Officer went to the main deck where he spoke to Roeder. He assigned Roeder to work one area of the deck and Colson another.

13. The Chief Officer specifically ordered each man to remain working in those areas and keep apart, refraining from any further arguments or physical

---

1. The court found that there was a genuine issue of fact as to whether Roeder was fined simply for fighting or for fighting in wilful disobedience to a lawful order of the Chief Mate. A subsidiary issue identified was whether the withholding was illegal for violation of 46 U.S.C. § 702 which requires entry of the offense in the log book, "on the day on which the offense was committed". If so, the question before the court is whether the deduction was made with sufficient cause.

Roeder v. Alcoa Steamship Co., Inc., 422 F.2d 971 (3rd Cir. 1970).

2. Plaintiff, in his case, introduced the vessel's Official Log-Book and a letter of January 13, 1969 which indicated the enclosure of a check for $13.85 representing the withheld wages. Defendant's motion for a Directed Verdict was denied. The defense called Kenneth E. Graham, Chief Officer of the Alcoa Master. The testimony of Chief Officer Graham was complete, unequivocal and worthy of belief.

contact. After being satisfied that harmony had been restored, Graham left the deck.

14. At approximately 4:50 p. m. the Boatswain reported that Colson and Roeder had a fight on the afterdeck.

15. After having been ordered to remain in his assigned work area, Roeder left his assigned station and engaged in a fight on deck.

16. Both Colson and Roeder were advised by Chief Office Graham that they were to be logged for fighting and disobeying his orders.

17. On July 2, 1965, the following log entry was made in the Rough Deck Log by Chief Mate Graham.

"At approximately 1650 I was notified by the Bosun, S. F. Manard, that R. M. Roeder, Dk. Mt. was injured. Upon investigation I found he had been fighting with O. S. Colson. He had a cut on left temple and he complained of his left ribs hurting. I taped his ribs and put a bandage on his temple. K.E.G.

I notified Master and he, Chief Engineer and myself made complete search of all quarters for contraband—found one bottle of whiskey belonging to O.S. Serpas."

18. Roeder sustained injuries in the fight which were so severe as to cause Roeder to remain in his room.

19. Chief Officer Graham reported the incident involving Roeder and Colson, including his specific commands and their violation, to the vessel's Captain and requested that both men be logged for fighting in disobedience to his orders.

20. On July 4, 1965, the following log entries were made by the Master in the vessel's Office Log-Book.

"At Sea

July 4, 1965 Robert M. Roeder, Dk. Maint. Z–481761, is logged one day's pay in the amount of $13.85. Fighting aboard ship P.M. July 2nd.

K. E. Graham  A. Obren
 Ch. Mate   Master

At Sea

July 4, 1965, the above entry read and copy given Robert Roeder, and his reply is as follows: NO REPLY.

K. E. Graham  A. Obren
 Ch. Mate   Master

At Sea

July 4, 1965, James R. Colson, O.S. Z–1067915, is logged one day's pay in the amount of $9.56. Fighting aboard ship P.M. July 2nd, causing injury to Crewmember.

K. E. Graham  A. Obren
 Ch. Mate   Master

At Sea

July 4, 1965. The above entry read and copy given to James Colson, and his reply is as follows: NO REPLY.

K. E. Graham  A. O. Obren
 Ch. Mate   Master"

21. Because of his physical condition the log entry was read to Roeder in his quarters by the Master in the presence of Chief Officer Graham.

22. Roeder was given a copy of the log entry and an opportunity to reply to the charge. Roeder gave no reply.

23. At the end of the voyage, $13.85 was deducted from plaintiff's wages and was withheld by defendant until January 13, 1969.

24. The actual reason why Roeder was logged and fined was for fighting in wilful disobedience to a lawful order given by Chief Mate Graham.

25. The Forecastle card—or fo'c'sle card, as it is usually pronounced, was posted as required by law, and is to a considerable degree a reproduction of the first page of the articles.[3]

3. 46 U.S.C. § 577 makes it obligatory on the part of the Master of a merchant vessel of the United States, at the commencement of every voyage or engagement, to cause a legible copy of the agreement (omitting signatures) to be placed or posted up in such part of the vessel as to be accessible to the crew under a penalty not exceeding one hundred dollars.

26. The articles specify that:

"*the crew agree to conduct themselves in an orderly, faithful, honest, and sober manner*, and to be at all times diligent in their respective duties, and to be obedient to the lawful commands of the said master, or of any person who shall lawfully succeed him, and of their superior officers, in everything relating to the vessel, and the stores and cargo thereof, whether on board, in boats, or on shore; and in consideration of which service to be duly performed the said master hereby agrees to pay to the said crew, as wages, the sums against their names respectively expressed, and to supply them with provisions according to a listed scale." (emphasis added)

27. The articles specify that "No dangerous weapons or grog allowed, and none to be brought on board by the crew."

## DISCUSSION

46 U.S.C. § 701(4) provides, in part:

"Whenever any seaman who has been lawfully engaged or any apprentice to the sea service commits any of the following offenses, he shall be punished as follows:

'Fourth. *For wilful disobedience to any lawful command at sea*, by being, at the option of the master, placed in irons until such disobedience shall cease, and upon arrival in port ·by forfeiture from his wages of not more than four days' pay, or, at the discretion of the court, by imprisonment for not more than one month.'" (emphasis added)

The crew's obligation to the vessel is summarized in part in the following statement which appears on the face of all shipping articles:

"*And the said crew agree to conduct themselves in an orderly, faithful, honest and sober manner*, and to be at all times diligent in their respective duties and to be obedient to the lawful commands of the said master, or of any person who shall lawfully succeed him, and of their superior officers, in everything relating to the vessel and the stores and cargo thereof, whether on board, in boats, or on shore, etc." [4] (emphasis added)

In the Condor,[5] the crew's responsibilities to their ship was epitomized as follows:

"   .   .   . A crew is obliged by its articles to stand by the ship and obey the Master until the voyage is done, unless she come to such a pass as to be dangerous to human life."

From the time that he signs the articles a seaman subjects himself to ship's discipline and the lawful authority of the Master and his superior officers. As to the necessity of discipline aboard the vessel, the same case stated:

"Discipline on the sea is not like that on land in ordinary industrial employments. The relations between master and man require an authority which is not necessary when ·both parties have immediate recourse to constituted authority. No doubt countless misery and brutality has arisen from the exercise of the master's authority; but the substance of that authority still remains in civilized countries, and must remain, if men are to put to sea for weeks, out of reach of the usual methods of keeping order."

■ This duty of obedience has not lessened with the passage of time. The sailor must obey the lawful orders of the Master and of his superior officers, and for wilfully disobeying their commands he may be punished.[6]

■ It is expressly stated in his contract that the seaman agrees to conduct himself in an orderly, faithful, honest, and sober manner. Implicit in the seaman's contract is an order that he re-

---

4. The shipping article is the contract of employment between the master and the seaman.

5. 196 F. 71 (D.C.N.Y.1912).

6. 46 U.S.C. §§ 701–705.

frain from fighting with his fellow crew members. Standing orders are as much a command as a verbal barracks room delivery with or without profanity. The foundation for such an order is the Master's responsibility for the safety of the ship, and for the safety of her crew and passengers, and for the safety of the cargo. A ship is itself an integral community of persons, always vulnerable to the elements, requiring a stubborn support of authority. It is the view of this Court that the logging of Roeder one day's pay for "Fighting Aboard Ship" is within the scope of 46 U.S.C. § 701(4).[7]

■ Here, Chief Officer Graham, upon being notified of the offensive conduct of Roeder, specifically ordered each man to work in separate areas of the deck, to remain in those areas and keep apart, and to refrain from any further arguments or physical contact. Such orders were justified, and the penalty assessed against Roeder for disobeying the order was warranted. Where a ship's officer has reason to believe that two seamen will fight if left together, he may order them to stay apart. If the order is given as a "specific command", then the men are obligated to follow it, or else suffer the penalties prescribed by § 701(4). Roeder v. Alcoa Steamship Co., *supra.*

■ 46 U.S.C. § 702 provided:

"Upon the commission of any of the offenses enumerated in section 701 of this title an entry thereof shall be made in the official log book on the day on which the offense was commit-

ted, and shall be signed by the master and by the mate or one of the crew; and the offender, if still in the vessel, shall . . . be furnished with a copy of such entry, and have the same read over distinctly and audibly to him and may thereupon make such a reply thereto as he thinks fit; and a statement that a copy of the entry has been so furnished, or the same has been so read over, together with his reply, if any, made by the offender, shall likewise be entered and signed in the same manner. In any subsequent legal proceedings the entries hereinbefore required shall, if practicable, be produced or proved, and in default of such production or proof the court hearing the case may, at its discretion, refuse to receive evidence of the offense."

The entry in the official Log Book was made two days after the offense, and therefore was defective. This deficiency is sufficient to make the withholding illegal.[8] A condition precedent to the enforcement of a forfeiture of wages is an entry in the official log book on the day on which the offense was committed.[9]

46 U.S.C. § 596 provides, in part:

"The master or owner of any vessel . . . making foreign voyages . . . [shall pay to every seaman his wages] within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens . . . . Every master or owner who refuses or neglects to make pay-

---

7. We do not minimize the necessity for a ship's officer making proper, concise and intelligible log entries, especially where the required entry relates to a penalty.

8. Offenses listed in 46 U.S.C. § 701 must be logged on the day on which the offense was committed. Where admittedly the entries were not made on the days the alleged offenses were committed, it is a proper exercise of the court's discretion to refuse to receive evidence of such offenses. And likewise, in the exercise of that discretion the court may receive evidence of an alleged offense, notwithstanding irregu-

larities in the Master's entry. 1 M. J. Norris, The Law of Seaman, § 132 (3d ed. 1970).

9. The making of prompt and regular log entries as soon as possible after the occurrence to which it relates insures the reliability of such entries. There is nothing in the instant case that would have precluded the Master from making the appropriate log entries on the date of the offense. The essence of 46 U.S.C. § 702 is the requirement that the log entry be made promptly. See also 46 U.S.C. §§ 201, 202, 203, 701, 702.

ment in the manner hereinbefore mentioned *without sufficient cause* shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed . . . ." (Emphasis added.)

In cases where there is a claim for a statutory penalty for a wrongful withholding, a question to be answered is whether the deduction was made "without sufficient cause" within 46 U.S.C. § 596 so that a penalty was triggered. Swain v. Isthmian Lines, Inc., 360 F.2d 81 (3rd Cir. 1966). Without sufficient cause means more than the absence of valid defenses to the claim for wages. The statute confers no right to recover double wages where the delay in payment of wages due was not in some sense arbitrary, wilful or unreasonable. Collie v. Fergusson, 281 U.S. 52, 50 S.Ct. 189, 74 L.Ed. 696 (1930). The offense having been proved, and there being substantial compliance with § 702, the witholding was not arbitrary or unreasonable. The statute was never intended to reward a miscreant seaman with a windfall recovery.

## CONCLUSIONS OF LAW

1. This is an action within the admiralty and maritime jurisdiction of this Court.

2. The Master of the SS ALCOA MASTER is responsible for keeping and maintaining the Official Log Book (46 U.S.C. § 201).

3. The wording of a log entry in the Official Log Book must be given great weight.

4. Because the substance of the protective features of 46 U.S.C. § 702 were met, the shipowner is not precluded from introducing evidence of the offense and that the deduction from Roeder's wages were made with sufficient cause.

5. Chief Officer Graham acted reasonably and within his authority as Officer in Charge of the deck department when he ordered Roeder and Colson to remain apart, to refrain from arguing among themselves and to keep from physical contact with each other.

6. Roeder wilfully disobeyed the lawful command of his superior officer when he left his assigned work area and engaged in a fight with seaman Colson.

7. The Chief Officer had Roeder logged for wilful disobedience of the Chief Mate's orders pursuant to 46 U.S. C.A. § 701(4)

8. The logging of Roeder one day's pay for "Fighting Aboard Ship" is within the scope of 46 U.S.C. § 701(4).

9. 46 U.S.C. § 702 requires entry of the offense in the log book "on the day on which the offense was committed". The entry in this case was made two days after the offense, and it is therefore defective.

10. A condition precedent to the enforcement of a forfeiture is an entry in the Official Log Book on the day on which the offense was committed.

11. The deduction of one day's pay from Roeder's wages was made with sufficient cause.

12. Roeder is not entitled to penalty wages pursuant to 46 U.S.C. § 596.